THOMPSON, J.
 

 This is a suit' for $15,000 alleged to be due the plaintiff for making a sale of 278 shares of the capital stock of the Mansfield Light & Power Company owned by the several defendants named in the petition.
 

 
 *146
 
 It is alleged that petitioner agreed with Ned W. Jenkins, one of the stockholders and who represented the other owners of the 278 shares, to assist in making a sale of the said stock upon terms which would bring the owners a net price of $135,000.
 

 .That the said Jenkins, for himself individually and as agent for the other defendants, agreed that petitioner, in return for his services and assistance in making said s'ale, should have and receive the amount realized in excess of the net price of $135,000.
 

 That the stock was sold on the instructions or at the suggestion of- the petitioner for $150,000 and under his contract he is entitled to the excess price received.
 

 The defendants admit in their answer that an agreement concerning the sale of the stock was entered into with the plaintiff, but it is denied that the plaintiff jvas to receive all of the price of the sale in excess of $135,000.
 

 It is alleged that it was agreed that the plaintiff should accompany Prank A. Petty, one of the defendant stocknolders, to the office of the Louisiana Public Utilities Company, Inc., for the purpose of offering the shares of stock to the said Louisiana Public Utilities Company for the price of $140,000; said plaintiff agreeing to render any assistance and service that he could in order tb effect said sale.
 

 It is further alleged that the said Jenkins for the stockholders and the said plaintiff agreed that, in the event a sale to the utilities company was perfected at the price named, the defendants would pay the said plaintiff the sum of $5,000 for services rendered by him in effecting the sale.
 

 The petition and answer set out more in detail the respective claims, but we have stated substantially all that is necessary for the purposes of the decision of the case..
 

 There was judgment in plaintiff’s favor for $5,000 and rejecting the demand for the additional $10,000.
 

 The plaintiff has appealed.
 

 It appears that the 278 shares of the stock owned by the defendants constituted a majority of the capital stock issued by the Mansfield Light & Power Company.
 

 The balance of the stock was owned by the Louisiana Public Utilities Company.
 

 Negotiations for the sale of the stock-owned by the defendants through the plaintiff had been going on for some two years or more and' that the defendants were willing-to take net to them $135,ouO.
 

 The plaintiff was unable to get a buyer of the stock at any price and so admitted to Jenkins, the authorized representative of the majority stockholders. AH independent efforts of the plaintiff to sell the stock were terminated when he reported to the conference hereafter referred to that he had not been able to secure a purchaser.
 

 A conference was held between the plaintiff and Jenkins at the latter’s office on July 27 or 28, 1927, at which Petty was present.
 

 At this meeting it was agreed that' the stock should be offered to the utilities company by Petty and the. plaintiff for $140,000, and if sold .at that price the plaintiff was to receive for his services $5,000. There was no discussion as to a greater price for the-stock, nor was there any agreement to pay the plaintiff any compensation other than the $5,000. This agreement with respect to the amount for which the stock was tó be offered and the fee plaintiff was to receive is admitted by the plaintiff.
 

 
 *148
 
 The plaintiff, when asked as a witness what was the agreement reached relative to the sale of the stock, said that Petty asked the question as to what Bill (meaning the plaintiff) was to get out of the sale, and the plaintiff answered, himself, that of the $140,-000 he was to get $5,000.
 

 Then again on page 117 of the transcript he was asked to state the agreement between the parties, and answered as follows: “The agreement unquestionably was this: A price of $140,000.00 was to be asked of the Louisiana Public Utilities Company for the 278 shares of stock, and I was to receive $5,000.00 at that figure, which meant that the holders of this stock would receive $135,000.00 net to them.”
 

 The plaintiff was further asked if Mr. Jenkins at that meeting stated that he would take $135,000 net for the stock and that “you (Barrett) could have all above that you might sell it for.” To which plaintiff answered, “No.” The question was repeated and again answered: “He did not.”
 

 In answer to several different questions along that line, the plaintiff plainly and emphatically answered that no price above $140,-000 was discussed and no commission or remuneration to him was mentioned or discussed other than the $5,000 based on the sale price of $140,000.
 

 There is no substantial conflict between the .testimony of the plaintiff and that of Jenkins in reference to the price at which the stock was to be offered and the commission the plaintiff was to receive for his services.
 

 It was agreed that Petty and Barrett were to act jointly in presenting the offer of $140,-000 to the utilities company.
 

 However, before doing so. Barrett suggested to Petty that he make an offer of $150,-000 in order to provide a trading.margin.
 

 Nothing, however, was said about an additional compensation to Barrett and the proposed increase in the sales price of the" stock was without the knowledge of Jenkins. Petty at first demurred to the increased price of the stock for fear that it would prevent the sale at $140,000.
 

 He yielded, however, and made the offer as suggested by Barrett.
 

 The utilities company insisted on a few days’ delay to consider the offer.
 

 In the meantime Petty informed Jenk'ins of the increased price at which the stock had been offered, and the latter replied all right.
 

 Jenkins could have said nothing else. He could not be expected to have withdrawn the offer, and naturally, if the offer was accepted, the stocirholders would be benefited by the higher price. No claim was made by Barrett either to Petty or to Jenkins for the additional amount added at his suggestion to the sales price as originally agreed upon.
 

 After the offer of the stock to the utilities company had been made, Barrett called Petty aside and told him not to let it be known that he was making $15,000 out of the sale, because it might prove a hazard to the deal. Jenkins, it must be remembered, had no knowledge whatever of what was taking place between Petty and Barrett, who, as stated, were jointly authorized to make an offer of the stock to the utilities company.
 

 The utilities company finally accepted the offer, and the sale was effected at $150,000.
 

 From what has been said it is as certain as any fact can be made certain that there
 
 *150
 
 was no' agreement by Jenkins or by any one else authorized to represent the defendants to pay the plaintiff any sum in excess of $5,000 to effect the sale of the stock.
 

 The only theory on which the plaintiff could lay claim to the extra $10,000 is by acquiescence of Jenkins and Petty in the sale as finally made. There was no acquiescence of Jenkins in the claim of the $10,-000 for the all-sufficient reason that Jenkins did not know that plaintiff was claiming or int.ended to claim the additional price. Any act of Petty could not bind the defendant, for he had no greater authority in the matter than the plaintiff himself.
 

 The plaintiff knew the extent of Petty’s authority, which was limited to making the offer of the stock at $140,000.
 

 . [2] Petty had no authority, to the knowledge of the plaintiff, to agree to give to the plaintiff all that the stock was sold for above the $140,000; even if Petty knew of the contract to pay a fee of $5,000, which he denies, his failure to protest when the plaintiff asked him to keep secret the fact that he (Barrett) was to get $15,000 could not affect the rights and interest of the defendants.
 

 ■ [3] In their brief counsel for the plaintiff state that the contract shows nothing about the ownership of the additional $10,-000.
 

 That under the contract defendants have no right whatever to the additional ambunt even as against the utilities company, the purchaser.
 

 We confess our inability to appreciate the purpose or force of such an argument.
 

 The defendants owned the stock, and we know of no reason in law why they should not be entitled to the price for which the stock was sold, in the absence of any agreement or any act of theirs by which they bartered away the price.
 

 Much has been said as to what took place before and after the sale of the stock.
 

 All negotiations before the sale terminated when the contract made the basis of the suit was entered into. However, there is nothing in those negotiations that would affect the conclusion we have reached.
 

 What happened after the sale of the stock was completed can have no possible effect on the interpretation of the contract, nor can it tend in any way to prove an acquiescence in plaintiff’s claim or a surrender of defendants’ right to the $10,000.
 

 The thought of the plaintiff in increasing the price was originally to leave a margin on which to trade. And he did not let it be known to any one that he was going to claim the extra amount until after the offer was made to the utilities company.
 

 And even then the claim was only made inferentially to Petty by asking him not to let it be known that he was making $15,000.
 

 He kept this thought of claiming the amount as a secret in his own breast in so far as the defendants were concerned.
 

 The judgment appealed from is correct, and therefore affirmed at the cost of appellant.